## BURNS v. UNITED STATES.
### No. 6798.

Circuit Court of Appeals, Ninth Circuit.
June 20, 1932.

Otto Christensen, of Los Angeles, Cal., for appellant.

Samuel W. McNabb, U. S. Atty., and Harry Graham Balter, Asst. U. S. Atty., both of Los Angeles, Cal.

Before WILBUR and SAWTELLE, Circuit Judges, and NETERER, District Judge.

WILBUR, Circuit Judge.

This appeal is taken by appellant from an order revoking a probationary order upon the suspended execution of a sentence of five years in the United States penitentiary at McNeil Island, state of Washington, and issuing a commitment in accordance with the original sentence.

The appellant pleaded guilty to three counts of an indictment and on May 4, 1931, was sentenced upon the first count to imprisonment in the Los Angeles County jail for a period of one year, and on the second count was fined $2,000, and to stand committed to the Los Angeles County jail until paid; on the third count was sentenced to five years imprisonment in McNeil Island penitentiary. The probationary order is as follows: "Execution of said sentence of imprisonment on the third count is suspended during such time as the defendant reports regularly every three months in writing, beginning with this date, to the Federal Probation Officer of this court; during which time he entirely refrains from any violation of any law with the possible exception of parking and traffic ordinances, and in all respects conduct himself as a law abiding citizen. In case of the violation of the terms of probation, the defendant will be brought before the Court and sentenced."

On January 21, 1932, appellant was brought before the court for hearing on the question of the revocation of probation. Thereupon, without previous notice to the defendant, the judge announced his intention of proceeding with the hearing. Upon request of the appellant, the hearing was postponed for one hour, during which time he secured the attendance of an attorney to represent him on the hearing. The attorney requested a continuance of the hearing, but this was refused. The court stated: "The newspapers for several days have been full of accounts reflecting, in most serious measure and degree, upon this defendant who pleaded guilty to certain offenses, was given a jail sentence and also sentenced to a term in the Federal Penitentiary, which was suspended during the period of his good behavior. This is an extremely simple matter that the Court has before it. The question is whether he has violated the terms of his probation. The matter was brought to the attention of the Court by the United States attorney's office, whereupon the Court ordered that the defendant be brought before the Court. We are here now to investigate. I don't feel that it is a matter in the nature of a trial, and, inasmuch as the matter has been brewing for several days, and the defendant himself might have anticipated such a proceeding, I see no harm in going ahead with the proceedings necessary to determine the question be-

fore the Court. Therefore, the request for a continuance is denied."

Thereupon, and over the objection of the appellant, testimony was adduced to the general effect that during the period for which the appellant had been committed to the Los Angeles county jail he had frequently been absent from the jail. The order of the court revoking probation was based upon this proposition, as appears from the statement of the court at the conclusion of the hearing:

"Now, gentlemen, there is enough obviously before this court to show that the spirit of the probation was not in any 'sense complied with. The idea that one person sentenced to the county jail should over a period of 3 months a little bit more than 3 months, be taken out for on 15 different occasions from 10 o'clock in the morning until 9 o'clock at night, oftentimes, that of itself is something that should bring the blush of shame to anybody entrusted with the execution of the law.

"That fact alone is contrary entirely to the spirit of probation. Probation supposes penitence, a degree of penitence. I very much regret that any court should be compelled to listen to the failure of performance of the official duty that has been related here today. And my earnest suggestion is that that prisoner and everybody else stand hushed when the instruments of the law are made the convenience, the accommodation, the servants of the defendants.

"The probation given to this defendant, granted this defendant is cancelled, nullified, and it is ordered that forthwith the United States marshal execute the sentence originally pronounced, that being confinement in the Federal penitentiary at McNeil's Island, in the State of Washington, for the period of 5 years."

Upon the hearing, one A. P. Rumburg, special agent of the United States Department of Justice, testified that he saw the appellant on August 18, 1931, at appellant's home; that he investigated the jail records, and ascertained therefrom that upon the ostensible authority of an order of the United States District Judge appellant had been absent from the jail on fifteen different days for periods ranging from three hours and fifty-eight minutes to thirteen hours; that the records of the county jail showed that with the exception of one day the appellant was released in the custody of the United States Deputy Marshal Lessner, and on that day to one Jones; that he had ascertained that a

United States District Judge had authorized appellant's release for the purpose of taking him to a dentist; that the order was in writing dated May 8; that at the time of the visit to appellant's house on May 18 United States Deputy Marshal Lessner stated that he had taken the appellant from the county jail upon an order of the United States District Judge.

Appellant's counsel objected to the introduction of jail records, cross-examined the witness at some length, but was not permitted to continue the cross-examination as long as he desired, and excepted to the refusal of the court to permit further examination.

R. S. Zimmerman, clerk of the court, testified that, while it was the usual practice to have an order entered before a prisoner could be released from the county jail, no such order had been entered ordering the release of appellant.

The appellant testified on his own behalf that he had been in the county jail eight and one-half months on his sentence, and during all but thirty days of that time he had been a trusty. With reference to his absence from the county jail he testified as follows:

" 'Q. Do you know how you happened to be taken out of the jail house? A. Why, if I don't remember wrong, I think that Ames Peterson, I think that was he who it was that went to Judge James and explained the situation that my teeth were bad, that he would like to have the court order me to go to a dentist to have them repaired. And Judge James, he got it.'

"That at the times he was out of the county jail he went to the dentist's office; that he saw the orders; that there was more than one order issued; that he didn't remember the exact wording of them; that one Jones had an order to take him out also and he guessed that it was for only once, and that Lessner had the other order.

" 'Q. Do you recall whether those orders were for treatments or for specific occasions? A. For treatments.'

"That he had a lot of work done and as a matter of fact he was not finished with it yet."

" 'Q. And actually what—would he give you treatments? A. Oh, yes, sir. Sure; you can look at my mouth and see that work that is unfinished right now.

" 'Q. How long would he work on your mouth each time you were there? A. Oh, it is according as to how much I could stand;

an hour or an hour and a half; sometimes more. I would rest a little while; he would work more.

" 'Q. What was the name of your dentist? A. It has been so long since I have been there, I can't really recollect what is his name.

" 'What is his office at? A. Hollywood Boulevard and Cherokee Street.'

"That when he went to this dentist and left the county jail that he would go under the assumption that he could legally do so under a court order; that he absolutely did not pay anybody to get out or perform any favors for him while he was out; that he never rewarded Mr. Jones or Mr. Lessner on any of these occasions, but might have given them a cigar. * * *

" 'I could look in a phone book and tell you in a moment the name of the dentist'; that he did not go to the dentist each and every time that he went out of jail; 'I would call him and if he could take me if he wasn't, his appointments were not all made for that day, he would take me; it was only a couple of times that I didn't—just a few times.'

" 'Q. By Mr. Redwine. Now, the record shows on May 30th, you left the jail on May 30th, at 10 o'clock a. m. and did not return until 9:06 p. m. You were not in his office all of that time? A. No, sir, I don't remember the incident, but I don't suppose I was.

" 'Q. What did you do? A. Well, I might have had something to eat.

" 'Q. What else did you do? A. That is all.

" 'Q. Well, what were you doing until 9:06 p. m. in the evening? A. Well, listening to the radio, something like that.

" 'Q. Where were you listening to the radio? A. At my home.

" 'Q. How many times did you go to your home when you were really supposed to be going to the dentist? A. Well, I really couldn't tell you, just quite a few times.

" 'Q. Most of the time? A. Pretty near.

" 'Q. Did you give Mr. Lessner anything for taking you to your home? A. Absolutely not.

" 'Q. Do you know why it was that he should be willing to stay out until 9, and after 6 o'clock at night when he took you down to your home if you didn't give him any remuneration? A. I don't know. I never give him any remuneration.

" 'Q. Did you give him any liquor of any kind? A. Absolutely not.

" 'Q. Well now, on May 14th, you were taken out of jail at 9:25 a. m. and returned at 4:50 p. m. Were you in the dentist's office all of that time? A. From 10 to 5, that is practically—

" 'Mr. Redwine. Yes. A. Well, I might have got to the dentist around noon, and would be there a couple of hours by the time to get back here, it was pretty close to that.

" 'Q. Why was it that you didn't call up the dentist's office before you left the jail to see whether you could have an appointment or not? A. You cannot telephone from the jail.

" 'Q. What arrangement did you make with Lessner to come over and take you out of the jail and pick you up at the county jail? Did he just say, "Come on, we will go up to the dentist's office?" A. Well, for instance, if I had a date today with the dentist a week or more, when they would ask him when he could see me again, he would state some date—

" 'Q. You knew also—

" 'Mr. Christensen. Let him finish.'

"The witness further testified that he was a prisoner in the county jail, knew that the marshal had come to the county jail to take him out of the county jail and that it was the usual thing to get permission to go to the dentist's office; that it was the usual thing with a lot of people.

" 'Q. Why was it that you didn't make an appointment then with the dentist for a particular date? A. For the reason that the marshal was not able to get there and come and get me, because he was doing something else.'

"The witness then further testified that at the time Mr. Lessner and Mr. Rumburg were at his home on August 18th he was there about an hour and a half and that he had been to the dentist that day; that he didn't remember right then the name of the dentist, but that he could get it in a minute; that the dentist was on the corner of Hollywood Boulevard and Cherokee Street on the second floor of the building; that it was months ago and that the dentist has a very odd name.

" 'Mr. Christensen. May I suggest, in the interests of saving time—I intend to bring the dentist in, if I am permitted.

" 'The Witness. If I could get a phone book I could tell you.'

"The witness further testified that when he was out with Mr. Lessner he went to his home several times; that he did not go to his home every time.

" 'Q. You went practically every time you

left the jail, you went to your home sooner or later during the period you were out of the jail? A. No, not every time.

" 'Q. You think you during that time would stay out and have supper out very often? A. I had a little bite to eat. If it would be supper, it would be earlier than supper.

" 'Q. How did Lessner know when you wanted to leave the jail? Did you send word over there to him? A. I want to explain that if I may, I could explain that in a minute. If, for instance he would take me out today, I would go to the dentist, I would ask the dentist would he be ready for me again, when he would be ready for me again. Well, if he would say, for instance, next Tuesday, then I would say to Mr. Lessner, "Well, the dentist can take me next Tuesday." Then, if Mr. Lessner's duties were such that he could take me out, he would do so. If not, I would have to stay there. Consequently, it was quite a jumbled up affair in keeping our affairs with the dentist.

" 'Q. When you left the jail and didn't go to the dentist's office were you and Lessner riding around or were you at your house and would Lessner ride around, is that right? A. Yes.'

"On redirect examination the witness testified that when he was out he asked to be taken home to get a change of clothes; that usually each time he went to the house he went for a change of linen; that by looking at the telephone book he could give the district attorney the name of the dentist."

We have quoted at length from the testimony of appellant because it shows that appellant admitted that he had been frequently away from the jail in custody of a deputy United States marshal, that these visits were for his own convenience, and that they were not confined to trips to and from the dentist's office. The judge evidently considered that this conduct justified the revocation of the probation, regardless of the exact terms of the order which counsel sought to produce, for the reason that, in any view of the matter, appellant's conduct was not justified. The order of revocation was not based upon a technical escape, but upon the fact that the appellant had not acted in good faith in carrying out the order of the trial judge, but, on the contrary, had taken advantage of a general permit to carry out his own purposes quite independently of the basis and theory upon which the order was given.

We have thus far refrained from mentioning another subject of inquiry before the court at the time of the proceedings looking toward the revocation of probation, for the reason that the order is not predicated from the evidence thus adduced. The effect of the evidence offered against appellant upon this subject was that he had attempted to influence a witness confined in the county jail to make a false statement in an affidavit for the purpose of defeating the prosecution in that case, knowing that the statement was false. The appellant denied the testimony thus adduced, and, while appellant's counsel desired to offer further testimony to rebut the evidence against him, we must assume that the court's refusal to permit such testimony was predicated upon the belief that the matter was immaterial, in view of the conclusion he had reached on the question of the conduct of the appellant in absenting himself from the jail.

The appellant's contention is that he is entitled to a hearing upon the charges against him as a constitutional right under the due process of law clause of the Federal Constitution. The trial judge was of the opinion that the proceedings were summary. The statute upon which the court acted, 18 USCA § 725, 43 Stat. 1260, § 2, provides as follows: "At any time within the probation period the probation officer may arrest the probationer without a warrant, or the court may issue a warrant for his arrest. Thereupon such probationer shall forthwith be taken before the court. At any time after the probation period, but within the maximum period for which the defendant might originally have been sentenced, the court may issue a warrant and cause the defendant to be arrested and brought before the court. Thereupon the court may revoke the probation or the suspension of sentence, and may impose any sentence which might originally have been imposed."

There are two lines of decisions dealing with the power of the court to revoke probation. In one line of decisions it is held that the probationer is entitled to a hearing upon the charge against him, and that the order of probation can be only revoked upon cause thus shown. It is also held in all such cases that the cause must be either a violation of the law or of the terms of the order granting probation, or the instructions issued in pursuance thereof. Other decisions hold that the granting of probation is an act of grace which may be summarily revoked at any time.

The Circuit Court of Appeals of the Second Circuit, speaking through Judge Mack, who has had a great deal of experience with probation matters, said: "The act itself has

no express restrictions on the power to revoke the probation or to modify the terms, conditions, or time thereof. These are matters for the exercise of a sound judicial discretion. The remedy for an abuse of such discretion or for other irregularities or errors in the exercise of the jurisdiction is solely by appeal, not by writ of habeas corpus." United States ex rel. Grossberg v. Mulligan, 48 F.(2d) 93, 94.

In Furrow v. United States, 46 F.(2d) 647, the Circuit Court of Appeals of the Second Circuit had under consideration a direct appeal from an order revoking probation. It appeared that the appellant in that case had no written notice of the alleged infractions of the terms of probation, and that counsel, although aware of the nature of the charges, delayed making motion of continuance until the time set for hearing. The court concluded that the appellant had notice of the charge against him, was not taken by surprise, and had an opportunity to defend himself. Under these circumstances, the court stated that, as there was ample evidence to support the conclusion of the trial court, the order would be sustained.

 It should be borne in mind in dealing with the question of probation and violation thereof, that the extending of probation to a person convicted of crime is purely a matter of grace, and that the revocation thereof is merely a withdrawal of the leniency so extended. The term of imprisonment which follows the revocation of probation is for the commission of the offense with which the probationer stands convicted, and is not in any sense a punishment for the violation of the terms of the probation. Congress, in giving the power of revocation, or, perhaps it should be said, in recognizing the inherent power of the court to revoke its order suspending the imposition or execution of a sentence, has attached no condition whatever to such revocation. Assuming, without deciding, that Congress had the power so to do, it has not in fact done so. People v. Court of Sessions, 141 N. Y. 288, 36 N. E. 386, 23 L. R. A. 856. Should the courts under such circumstances attach conditions and restrictions to the power of the trial judge? The whole theory of probation is that of giving to the convicted person an opportunity for reformation, and, when it is manifest that the probationer is not taking advantage of the opportunity given him, probation should be revoked, and the appropriate sentence for the crime theretofore committed should be imposed or executed. When that point has arrived in the history of the probationer where it is sufficiently manifest to the judge that the object of probation has failed, there is no reason why probation should not be revoked. In extending probation, the judge acts upon his knowledge of the character and situation of the convicted person and usually upon expressions of penitence and promises to reform, and is thus in a position to determine when these promises are without intention or power to perform.

The Circuit Court of Appeals of the Fourth Circuit in Riggs v. United States, 14 F.(2d) 5, 9, had occasion to consider the question of revocation of probation. The matter was presented by writ of habeas corpus and also by direct appeal. After stating the purposes of probation and the necessity of conferring great latitude on the District Judges in enforcing the same in order to accomplish the objects of probation the court said: "It is not necessary that we pass upon the defendant's contention that he was entitled to a hearing upon the question of the breach of the terms of his probation, for it affirmatively appears of record that at the time of the revocation of the probation and imposition of sentence he was present in his own proper person, and the government made it appear by evidence satisfactory to the court that the conditions of the probation had been violated, and no exception appears to have been taken to such action of the court."

District Judge Sibley in Campbell v. Aderhold (D. C.) 36 F.(2d) 366, 367, said: "Probation is wholly discretionary and of grace, and not at all a right. It is in no sense a bargain. If the judge becomes satisfied that the probation is a failure and the best interests of the public and the defendant are not being subserved, and that different treatment is required, he has the right and the duty to terminate the experiment and let the law take its original course. * * * Unless the broad discretion to revoke be fully recognized, much greater caution will have to be exercised in extending this grace originally, and the benefits of the act will become greatly restricted."

 It has been held by a number of state courts that probation may be revoked summarily without a hearing. People v. Dudley, 173 Mich. 389, 138 N. W. 1044; People v. Trombly, 173 App. Div. 497, 160 N. Y. S. 67; People v. Goodrich (Sup.) 149 N. Y. S. 406. It is unnecessary to decide in this case whether probation can be revoked arbitrarily and without a hearing. In the case at bar, appellant knew that he was charged with being unlawfully and improperly outside the

prison to which he had been sentenced. He was represented by an attorney, evidence was adduced against him; and in his testimony he admitted the truth of the charge. Any evidence he sought to adduce on his behalf in that regard was by way of extenuation. The judge certainly was not required to hear this evidence, if, in his opinion, it was immaterial.

Order and sentence affirmed.